**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

DENNIS L. MONTGOMERY

                Plaintiff,

    v.

SIMON & SCHUSTER,

and

PRISCILLA PAINTON,

and

TINA BENNETT,

                Defendants.

Miscellaneous Case No. 1:15-mc-00363-P1

## MOTION FOR ADMISSION PRO HAC VICE

      Pursuant to Rule 1.3 of the Local Rules of the United States Courts for the Southern and Eastern Districts of New York, I, Larry Klayman, hereby move this Court for an Order for admission to practice Pro Hac Vice to appear as counsel for Plaintiff Dennis Montgomery in the above-captioned action.

      I have continuously been in good standing of the bars of the states of Florida and the District of Columbia and there are no pending disciplinary proceedings against me in any state or federal court.[1]

---

[1]See Appendix, attached.

Dated: November 24, 2015

Respectfully submitted,

*/s/ Larry Klayman*

Larry Klayman
Klayman Law Firm
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of November 2015, a true and correct copy of the foregoing was filed and served via ECF in the U.S. District Court for the Southern District of New York upon the following:

**Sanford Lewis Bohrer**
**Brian Toth**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman**
**Micah Ratner**
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com

*Attorneys for James Risen Defendant*
*Attorneys for Houghton Mifflin Harcourt Publishing Company Defendant*
*Attorneys for Houghton Mifflin Harcourt Company Defendant*

**Andrew Nieh**
Assistant General Counsel, Litigation and Compliance
CBS Corporation
51 W. 52nd Street
New York, New York 10019
Tel: (212) 975-4239
Fax: (212) 975-3930
Email: andrew.nieh@cbs.com

*Attorney for Simon & Schuster Defendant*
*Attorney for Priscilla Painton Defendant*

**Kevin Marino**
Marino, Tortorella & Boyle, P.C.
437 Southern Blvd.
Chatham Township, New Jersey 07928
kmarino@kmarino.com

*Attorney for Tina Bennett Defendant*

*/s/ Raymond Negron*
Raymond Negron, Esq.

APPENDIX

Pursuant to an order of the Honorable Denny Chin of February 5, 1997, nineteen years ago, this order is being appended to this application. The matters which Judge Chin discussed in his order were subsequently reviewed by Bar Counsel for the District of Columbia Bar and The Florida Bar and applicant was not found to have acted unethically.

While the application asks whether there are pending disciplinary proceedings in any state or federal court, and the answer is no, there is a matter pending before the Board on Professional Responsibility of the District of Columbia Bar which has not been adjudicated. It concerns a stale claim made eight years ago by the current directors of Judicial Watch, which applicant founded and managed for about 10 years before he left to run for the U.S. Senate in Florida, that by representing a former client who had been abandoned by these directors after he left, a donor who was defrauded by them of a substantial contribution and an employee who was harassed in the workplace, that he had a conflict of interest. Applicant maintains that as the founder and former chairman he had a duty to help these persons as they could not afford counsel. Applicant thus represented them pro bono, and as they would have been left defenseless could not get legal help otherwise. Renowned ethics professor Ronald Rotunda has reviewed the matter and found that the applicant did nothing wrong ethically. *See* Attached Ethics Opinion of Professor Rotunda.

# Supreme Court of Florida
## Certificate of Good Standing

*I JOHN A. TOMASINO, Clerk of the Supreme Court of the State of Florida, do hereby certify that*

### LARRY ELLIOT KLAYMAN

*was admitted as an attorney and counselor entitled to practice law in all the Courts of the State of Florida on* **December 7, 1977,** *is presently in good standing, and that the private and professional character of the attorney appear to be good.*



*WITNESS my hand and the Seal of the Supreme Court of Florida at Tallahassee, the Capital, this November 24, 2015.*

_____

*Clerk of the Supreme Court of Florida.*



# The Florida Bar

**651 EAST JEFFERSON STREET**
**TALLAHASSEE, FLORIDA 32399-2300**

JOHN F. HARKNESS, JR.
EXECUTIVE DIRECTOR

850/561-5600
WWW.FLORIDABAR.ORG

State of Florida          )

County of Leon          )

In Re:     246220
Larry Elliot Klayman
2020 Pennsylvania Ave. N.W., #345
Washington, DC

I HEREBY CERTIFY that I am the duly appointed custodian of membership records of The Florida Bar.

I FURTHER CERTIFY that the records in the office of the Clerk of the Supreme Court of Florida indicate that said attorney was admitted to practice law in the State of Florida on December 7, 1977.

I FURTHER CERTIFY that the records in the office of The Florida Bar indicate that the above attorney is an active member of The Florida Bar in good standing.

Dated this ⌒th day of November, 2015.

Pam Gerard, Manager
Membership Records Dept.
The Florida Bar

PG/CL/ssF10:R10



**District of Columbia Court of Appeals**
Committee on Admissions
430 E Street, N.W. — Room 123
Washington, D. C. 20001
202 / 879-2710

I, *JULIO A. CASTILLO*, Clerk of the District of Columbia Court

of Appeals, do hereby certify that

# LARRY E. KLAYMAN

was on **DECEMBER 22, 1980** duly qualified and admitted as an

attorney and counselor entitled to practice before this Court and is,

on the date indicated below, an active member in good standing of

this Bar.

In Testimony Whereof, I have
hereunto subscribed my name
and affixed the seal of this Court
at the City of Washington, D.C.,
on **NOVEMBER 6, 2015**.

JULIO A. CASTILLO
Clerk of the Court

By: _____
        Deputy Clerk



ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and
Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/

2 June 2014

Board on Professional Responsibility
430 E Street, NW
Suite 138
Washington, DC 20001

RE: *In the matter of* Larry Klayman, Esq.  (Bar Docket No. 2008-D048)

My name is Ronald D. Rotunda.  I am the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University, The Dale E. Fowler School of Law, located in Orange, California, where I teach Professional Responsibility and Constitutional Law. I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review.  I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.

During the course of my legal career, I have practiced law in Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee. I am the co-author of Problems and Materials on Professional Responsibility (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States.  It has been the most widely used since I coauthored the first edition in 1976.  In addition, I have authored or coauthored several other books on legal ethics, including Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (ABA/Thompson, 11th ed. 2013).

In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume.  State and federal courts at every level have cited my treatises and articles over 1000 times.  From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline.  In fact, he, to the best of his ability, simply pursued an obligation that he knew that he owed to Sandra Cobas, Peter Paul, and Louise Benson.

Mr. Klayman, whose organization, Judicial Watch, was once engaged as attorneys for Paul (it never was engaged for Benson or Cobas), reasonably believed he had an ethical obligation to represent them, and chose to uphold his duty to these clients.  District of Columbia Rule of Professional Conduct 1.3 states that, "(a) A lawyer shall represent a client zealously and diligently within the bounds of the law."  Further, Rule 1.3(a) (comment 1) provides guidance on this issue and the duties of an attorney. "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."

Recall *Maples v. Thomas*, 132 S.Ct. 912 (2012).  In that case, two lawyers working in the firm of Sullivan & Cromwell entered an appearance for a client. These two associates worked pro bono and sought state habeas corpus for a defendant sentenced to death. A local Alabama lawyer moved their admission pro hac vice. Later, the two associates left the firm and their "new employment disabled them from representing" the defendant (one became a prosecutor and one moved abroad). Neither associate sought the trial court's leave to withdraw (which Alabama law required), nor found anyone else to assume the representation. Moreover, no other Sullivan & Cromwell lawyer entered an appearance, moved to substitute counsel, or otherwise notified the court of a need to change the defendant's representation.  When Mr. Klayman left Judicial Watch, no other lawyer for Judicial Watch stepped up to the plate, because in fact Judicial Watch had taken actions adverse and harmful to Paul, Benson and Cobas.  No lawyer stepped up to the plate in *Maples v. Thomas*.

The issue before the U.S. Supreme Court was whether the defendant showed sufficient "cause" to excuse his procedural default. Justice Ginsburg, for the Court, acknowledged that the usual rule is that even a negligent lawyer-agent binds the defendant. Here, however, the lawyers "abandoned" the client without notice and took actions which in fact harmed them thus severing the lawyer-client relationship and ending the agency relationship. This made the failure to appeal an "extraordinary circumstance" beyond the client's control and excused the procedural default. In the view of Mr. Klayman, he could not abandon the clients.

In applying these principles, it is reasonable and understandable that Mr. Klayman believed that had an ethical obligation, in accordance with perhaps the most important principle of this profession, to zealously and diligently represent his clients. More importantly, comment 7 observes that **"[n]eglect of client matters is a serious violation of the obligation of diligence."** Note that there is no credible claim that he used any confidence of Judicial Watch against Judicial Watch.

One should also consider Mr. Klayman's actions in light of the doctrine of necessity. We know that judges can decide cases even if they are otherwise disqualified if there is no other judge available to decide the case. For example, the Court of Claims applied the "rule of necessity" and held that, under that rule, its judges could hear the case involving their own salaries. Otherwise, no judge would be available to decide some important legal questions. The court then turned to the judges' substantive claim and denied it. *Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977) (per curiam), cert. denied, 434 U.S. 1009 (1978).  See also, *United States v. Will*, 449 U.S. 200 (1980). The *Will* Court explained: "The Rule of Necessity had its genesis at

least five-and-a-half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge."

Faced with the dilemma of either representing Cobra, Paul, and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. Judicial Watch attempted, and succeeded, at disqualifying Mr. Klayman from the lawsuits because it knew no one else would be able to represent Cobas, Paul, and Benson, and that Judicial Watch would escape liability for the wrongs that they had caused. The trial judge did disqualify Mr. Klayman in representing Paul in a new case after Paul's previous lawyers withdrew representation because he could not pay them, but note that the trial judge did *not* refer this case to the disciplinary authorities for further discipline. It appears reasonable to believe that the trial judge imposed all the discipline (in the form of a disqualification) that he believed should be imposed.  The situation involving these particular clients provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account.  Given this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct the wrongs caused by Judicial Watch, so that he would not violate D.C. RPC Rule 1.3. Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson.

There has been an unusual delay in instituting these proceedings against Mr. Klayman.  If this were civil litigation, Bar Counsel's Petition would obviously not pass muster under the District of Columbia statute of limitations. The general statute of limitations for most civil causes of actions in the District of Columbia is three (3) years.  D.C. Code § 12-301 *et seq.* "The purpose of statutes of limitation is 'to bring repose and to bar efforts to enforce stale claims as to which evidence might be lost or destroyed.'" *Medhin v. Hailu*, 26 A.3d 307, 313 n.7 (D.C. 2011) citing *Hobson v. District of Columbia*, 686 A.2d 194, 198 (D.C. 1996). "By precluding stale claims, statutes of limitations not only protect against 'major evidentiary problems which can seriously undermine the courts' ability to determine the facts,' but also protect[] a potential defendant's 'interest in security . . . and in planning for the future without the uncertainty inherent in potential liability,' and 'increase the likelihood that courts will resolve factual issues fairly and accurately.'" *Id.* Granted, the D.C. Rules of Professional Conduct do not expressly create a statute of limitations, the indisputable fact remains however that these proceedings — if they should have been brought at all — should have been brought years ago.

That brings up the problem of laches.  The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations. As held by the District of Columbia Court of Appeals, laches is the principle that "equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant. It was developed to promote diligence and accordingly to prevent the enforcement of stale claims." *Beins v. District of Columbia Bd. of Zoning Adjustment*, 572 A.2d 122, 126 (D.C. 1990). Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.,* 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id.*

Note that Mr. Klayman left Judicial Watch on September 19, 2003.  He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas.  This Bar Complaint was filed on May 1, 2014.  The delay in filing the complaint was nearly 8 years.

The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr. Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman.  The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches.  Such discipline, if the courts uphold it, can ruin his career.

This Petition also raises issues regarding the application of Mr. Klayman's Fifth Amendment due process rights.  Lawyers in attorney discipline cases are entitled to procedural due process. In *Ruffalo*, the respondent appealed his disbarment after records of his employments were brought up into his disciplinary proceedings at a late stage in the proceedings without giving him the opportunity to respond. In reversing, the U.S. Supreme Court held that the attorney's lack of notice that his full employment record would be used in the proceedings caused a violation of procedural due process that "would never pass muster in any normal civil or criminal litigation." *In the Matter of John Ruffalo, Jr.,* 390 U.S. 544, 550 (1968).

In *Kelson*, the Supreme Court of California similarly held that it was a violation of procedural due process for the State Bar of California to amend its charges on the basis of Mr. Kelson's testimony without having given Mr. Kelson notice of the charge and an opportunity to respond. *Kelson v. State Bar,* 17 Cal. 3d. 1, 6 (Cal. 1976).  *Kelson* is directly on point.  Judicial Watch submitted boxes full of voluminous documents to the Bar Counsel's office in secret, none of which were ever served to Mr. Klayman until the Petition was filed and then served.  It appears that Judicial Watch and Mr. Klayman have had a parting of the ways that has not been amicable.  One can understand why, even after all these years, a former employer who is very upset might wish to use the discipline process to punish a former employee, but that does not mean that the discipline authorities should aid and abet (even unintentionally) what appears to be a vendetta by one private group against its former lawyer.  Discipline, after all, exists to protect future clients and the public; it does not exist for one party to wreak punishment against another.

Further, these alleged ethical violations have already been dealt with by the Honorable Royce C. Lamberth in his Memorandum Opinion and Order in *Paul v. Judicial Watch, et al.*, No. 1:07-CV-00279 (D.D.C. filed Feb. 5, 2007). In his Memorandum Opinion, Judge Lamberth specifically addressed the issue of D.C. Bar Rule 1.9 in regard to disqualifying Mr. Klayman from continuing to represent Paul in the lawsuit. Judge Lamberth, in his ruling, found that "A survey of relevant case law in this and other circuits reveals some ambiguity with respect to the standard for disqualification in the face of a violation of Rule 1.9 (or its equivalent)." *Id.* at 6. Indeed, given the circumstances, and the harm that would be caused to Paul, it was ambiguous whether Rule 1.9 required Mr. Klayman's disqualification.  Judge Lamberth took "note of Paul's

4

argument that he will suffer prejudice if Mr. Klayman is disqualified." *Id.* at 14. Judge Lamberth emphasized that "[t]he essence of the hardship that Paul asserts will result from disqualification of Mr. Klayman is an inability to obtain alternate counsel for lack of financial resources" and ultimately apologetically found that "[t]he Court is not unsympathetic to this concern." *Id* at 14.

Immediately following Judge Lamberth's order, Mr. Klayman ceased all legal representation of Mr. Paul. No harm was caused by the limited and short-term representation that Mr. Klayman had provided. In fact, the harm was only done when Judicial Watch ceased representation of Paul, who as a result has been convicted of the alleged crimes and has since been incarcerated. Judge Lamberth did not sanction Mr. Klayman, or even report his actions to the Bar Counsel or the Board. Judge Lamberth recognized that the D.C. RPC was not clear when disqualification was necessary under Rule 1.9 and thus took no further action.

Given the delay in instituting these proceedings, it appears that Judicial Watch has targeted Mr. Klayman for selective prosecution. Seldom in the history of the District of Columbia Bar has someone been the subject of such an investigation for such a technical violation. To prevail on a defense of selective prosecution, one must simply prove that he was singled out for prosecution among others similarly situated and that the decision to prosecute was improperly motivated. *See, e.g. United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982). Here, Mr. Klayman is being investigated, and even charged, with an alleged ethical violation that otherwise would have been resolved as a result of Judge's Lamberth's decision to disqualify Mr. Klayman from the case.

For the foregoing reasons, it is my expert opinion that this bar complaint should not be pursued. Mr. Klayman, faced with what Judge Lamberth concluded was an "ambiguous" rule, understood that Mr. Klayman did not take on a case for personal profit but simply to protect the rights of those who could otherwise not pursue justice in the court system. Further justifying dismissal of this bar complaint is the unreasonably delay by the Office of Bar Counsel in bringing these allegations against Mr. Klayman. Mr. Klayman's defense of these alleged ethical violations has been severely prejudiced by the length of time that has passed since the events leading up to the bar complaint took place.

In sum, Mr. Klayman should not be disciplined. He did what he believed he had an ethical obligation to do by protecting his clients, at his expense.


Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence

**RONALD D. ROTUNDA**                                                April 27, 2015
Email: rrotunda@chapman.edu                  Home Page ✆ http://www1.chapman.edu/~rrotunda

**Office Address:**

>        Chapman University
>        Dale E. Fowler School of Law
>        Room 406
>        One University Drive
>        Orange, CA  92866-1005
>        ☎:      (714) 628-2698
>        Fax:    (714) 628-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

| | | |
|---|---|---|
| **Legal:** | HARVARD LAW SCHOOL | (1967- 1970) |
| | Harvard Law Review, volumes 82 & 83 | |
| | J.D., 1970 Magna Cum Laude | |
| | | |
| **College:** | HARVARD COLLEGE | (1963- 1967) |
| | A.B., 1967 Magna Cum Laude in Government | |

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

- 3 -

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000).  Best teacher selected by George Mason U. Law School Graduating Class of 2003.

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors.  Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times,* picked Professor Rotunda as one of the ten most influential Illinois Lawyers.  He was the only academic on the list.  He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

Ronald D. Rotunda

### LIST OF PUBLICATIONS:

### BOOKS:

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> 1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

> 1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

> 1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

> 1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

> 1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

> 1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

MODERN CONSTITUTIONAL LAW:  CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 1981).

1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

THE UNITED STATES FEDERAL SYSTEM:  LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE (Giuffrè, Milan, 1982) (with Peter Hay).

SIX JUSTICES ON CIVIL RIGHTS (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., 1984, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

**MODERN CONSTITUTIONAL LAW:  CASES & NOTES** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

**THE POLITICS OF LANGUAGE:  LIBERALISM AS WORD AND SYMBOL** (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

**TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

CONSTITUTIONAL LAW:  PRINCIPLES AND CASES (West Publishing Co., St. Paul, Minnesota, 1987).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

**Treatise on Constitutional Law:  Substance and Procedure** — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

헌법: 개인의 자유와 절차를 [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

> 2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

**CONSTITUTIONAL LAW** (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-West Group, St. Paul, Minnesota, 2001).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

**PROFESSIONAL RESPONSIBILITY** (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

**LEGAL ETHICS IN A NUTSHELL** (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

> 2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

> 2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

Ronald D. Rotunda

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, **FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION** (Korean Studies Information Co. Ltd.  Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

- 14 -                                                       Ronald D. Rotunda

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

2014 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Academic Publishing, St. Paul, Minnesota, 2014).

概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson Reuters, Eagan, Minnesota, 2014) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson Reuters, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA- Thomson Reuters, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, St. Paul, MN. 12th ed. 2014) (with Thomas D. Morgan & John S. Dzienkowski).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION** (Foundation Press, St. Paul, MN. 12th ed. 2014) (with Thomas D. Morgan & John S. Dzienkowski).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson Reuters, Eagan, Minn., 12th ed. 2014) (a Treatise on legal ethics, jointly published by the ABA and Thomson Reuters) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 11th ed. 2015)(unabridged edition).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 11th ed. 2015)(abridged edition).

**ARTICLES:**

*The "Liberal" Label:  Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant:  Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions:  An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74,* 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses:  A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE:  A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

Ronald D. Rotunda

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE
   LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal
   Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable
   Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW
   1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley
   Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence
   Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the
   American Assembly of Columbia University).

*When the Client Lies:  Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34
   (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78
   COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases:  Damage Actions versus Injunctive
   Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information:  The Duty to Convey and the
   Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time:  Can the E.R.A. Be Saved,* 64 AMERICAN BAR ASSOCIATION JOURNAL
   1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C.
   Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C.
   Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C.
   Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3
   CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW
   252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4
   CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews:  The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism:  A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights:  A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox:  What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in,  LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW
   JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW
   BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988
   at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988),
   reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS
   LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4,
   1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in,
   25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND
   MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988),
   reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1
   MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12,
   1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE
   RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court:  A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26,
   1988).

*Client Fraud:  Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*,
   1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW
   QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15
   (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989),
   reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989)
   (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised*?, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319  (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law:  An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

Ronald D. Rotunda

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions:  An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act*: *Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col.  4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col.  4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1  (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking:  A Brief Case Study*, 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display*: *Making Room for Religion in Public Forums*, LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000,  http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000,  http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

*in the Constitution of the USA: Sources And Evolution*, Law and Legislation, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, Champaign News-Gazette, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 Ohio State Law Journal 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, Chicago Tribune, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 The Professional Lawyer 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, Chicago Sun-Times, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions: Some Preliminary Data*, The Republican Lawyer (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 Cato Journal: An Interdisciplinary Journal of Public Policy Analysis 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, The Legal Times, Sept. 15, 2003, at p. 84.

*Found Money: IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 Cato Supreme Court Review 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, Chicago Sun-Times, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 Social Philosophy & Policy 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, Ellen Frankel Paul, Fred D. Miller Jr., & Jeffrey Paul, eds., Freedom of Speech (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, The Washington Times, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, National Review Online, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, Atlanta Journal-Constitution, May 14, 2004, at A19.

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21
    LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The
    Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April
    2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203
    (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE
    FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223
    (2007).

*Rudy    Thinks    FAST*,    THE    AMERICAN    SPECTATOR,    January    25,    2008,
    http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR
    ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-
    STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George
    Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES
    DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES
    (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15, 2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30, 2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510 (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010, http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD QwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010, http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2, http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21, http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010, http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010,    http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran*?, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment*?, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 MCGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution,* NATIONAL REVIEW ONLINE, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară,* REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier?*, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same*: *Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training,* 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What did he know, and when did he know it*?', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over: This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later*: *Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt*, DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

*The Ninth Circuit Departs from Tinker in Upholding Ban on American Flag T-Shirts in School*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, May 12, 2014, http://verdict.justia.com/2014/05/12/ninth-circuit-departs-tinker-upholding-ban-american-flag-t-shirts-school#sthash.pHSroRA6.dpuf

*Prayers before Meetings of the Town Board of Greece, New York*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, May 19, 2014, http://verdict.justia.com/2014/05/19/prayers-meetings-town-board-greece-new-york#sthash.pIt3d53k.dpuf

*Amending the First Amendment*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, June 9, 2014, http://verdict.justia.com/2014/06/09/amending-first-amendment

*Increasing Revenue by Lowering Taxes*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, June 23, 2014, http://verdict.justia.com/2014/06/23/increasing-revenue-lowering-taxes

*Changes in the Legal Profession and the Progress of Female Lawyers*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, July 7, 2014, http://verdict.justia.com/2014/07/07/changes-legal-profession-progress-female-lawyers#sthash.wKzv73e1.dpuf

*Banning the Export of American Oil*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, July 21, 2014, http://verdict.justia.com/2014/07/21/banning-export-american-oil

*Using Facebook as a Discovery Device*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Aug. 4, 2014, http://verdict.justia.com/2014/08/04/using-facebook-discovery-device

*Suing the President*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Aug. 18, 2014, http://verdict.justia.com/2014/08/18/suing-president

*IRS Monitoring Religious Groups*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Sept. 15, 2014, http://verdict.justia.com/2014/09/15/irs-monitoring-religious-groups

*A Special Counsel to Investigate the IRS Targeting of Tea Party Groups*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Sept. 29, 2014, http://verdict.justia.com/2014/09/29/special-counsel-investigate-irs-targeting-tea-party-groups

*Qualifications for Representatives,* in, THE HERITAGE GUIDE TO THE CONSTITUTION 64-67 (Regnery Publishing 2nd ed. 2014)(with David F. Forte).

*Privileges and Immunities Clause,* in, THE HERITAGE GUIDE TO THE CONSTITUTION 349-54 (Regnery Publishing 2nd ed. 2014)(with David F. Forte).

*Civil Forfeiture in Philadelphia*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Oct. 6, 2014, http://verdict.justia.com/2014/10/06/civil-forfeiture-philadelphia

*The Military Commissions Are Still Proceeding*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Oct. 20, 2014, http://verdict.justia.com/2014/10/20/military-commissions-still-proceeding

*Law Firms Creating In-House Ethics Counsel*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Nov. 3, 2014, http://verdict.justia.com/2014/11/03/law-firms-creating-house-ethics-counsel

*Targeting Political Speech for the Next Election*, WALL STREET JOURNAL, Nov. 5, 2014, p. A19, http://online.wsj.com/articles/ronald-rotunda-targeting-political-speech-for-the-next-election-1415145765

*The Problem of Inflating Billable Hours*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Nov. 17, 2014, http://verdict.justia.com/2014/11/17/problem-inflating-billable-hours

*The Mystery of Case Assignment in the Ninth Circuit,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 1, 2014, http://verdict.justia.com/2014/12/01/mystery-case-assignment-ninth-circuit

*The Ferguson, Missouri, Tragedy and the Future of Eyewitness Identification*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 15, 2014, http://verdict.justia.com/2014/12/15/ferguson-missouri-tragedy-future-eyewitness-identification

*Jonathan Gruber and the Wisdom of Crowds*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 29, 2014, https://www.facebook.com/ronald.rotunda/posts/10205409160371299?notif_t=like

*The President's Power to Waive the Immigration Laws*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Jan. 12, 2015, http://verdict.justia.com/2015/01/12/presidents-power-waive-immigration-laws

*The House of Representatives Lawsuit against the Executive Branch*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Feb. 2, 2015, https://verdict.justia.com/2015/02/02/house-representatives-lawsuit-executive-branch

*Je Suis Charlie Hebdo*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Feb. 16, 2015, https://verdict.justia.com/2015/02/16/je-suis-charlie-hebdo?utm_source=twitter&utm_campaign=wordtwit&utm_medium=web

*Protecting Rights in the Supreme Court*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Mar. 3, 2015, https://verdict.justia.com/2015/03/02/protecting-rights-supreme-court

*Lawyers Lying in Negotiations*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, MAR. 16, 2015, HTTPS://VERDICT.JUSTIA.COM/2015/03/16/LAWYERS-LYING-IN-NEGOTIATIONS

*King v. Burwell and the Rise of the Administrative State,* 23 U. MIAMI BUSINESS REV. 267 (2015)

*Hillary's Emails and the Law*, WALL STREET JOURNAL, March 17, 2015

*Is the Federal Government Really a State, if the IRS Says It Is*?, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Mar. 30, 2015, https://verdict.justia.com/2015/03/30/is-the-federal-government-really-a-state-if-the-irs-says-it-is

*Ignoring the Supreme Court When You Don't Like the Result*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 13, 2015, https://verdict.justia.com/2015/04/13/ignoring-the-supreme-court-when-you-dont-like-the-result

*The Way of Death in the Netherlands, Oregon, and, Perhaps, California*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 27, 2015, https://verdict.justia.com/2015/04/27/the-way-of-death-in-the-netherlands-oregon-and-perhaps-california

**Other Activities:**

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
CHAIR, Subcommittee on Model Rules Review (1992-1997).  [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA.  I traveled to Cambodia and worked with officials of UNTAC (the United Nations

Transitional Authority in Cambodia) and Cambodian political leaders, who were charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, Distinguished International Research Fellow at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, Associate Editor of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).



MACDRAW, INC., Plaintiff, - against - THE CIT GROUP EQUIPMENT
FINANCING, INC. and RICHARD JOHNSTON, Defendants.

91 Civ. 5153 (DC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*994 F. Supp. 447; 1997 U.S. Dist. LEXIS 21963*

February 5, 1997, Decided
February 5, 1997, Filed

**DISPOSITION:**    [**1]  Admissions of Larry Klayman, Esq. and Paul J. Orfanedes, Esq. pro hac vice revoked; any future applications by Messrs. Klayman and Orfanedes to appear before court on a pro hac vice basis denied.

**CORE TERMS:** vice, hac, jury trial, asking, post-trial, financing, undignified, deposition, accusations, administration of justice, disrespectful, sanctioned, degrading, frankly, advise, soul, bias, Disciplinary Rules, impartiality, discourteous, questioning, summary judgment, bad faith, reasonable basis, discipline, misconduct, appearing, recusal, lawsuit, sex

**COUNSEL:** RAMSEY CLARK, Esq., LAWRENCE W. SCHILLING, Esq., New York, New York, for Larry Klayman, Esq. and Paul J. Orfanedes, Esq., Respondents.

LARRY KLAYMAN, Esq., PAUL J. ORFANEDES, Esq., Klayman & Associates, P.C., Washington, D.C., for Plaintiff.

SUSAN G. ROSENTHAL, Esq., JEFFREY H. WEINBERGER, Esq., Winick & Rich, P.C., New York, New York, for Defendants.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

 [*447] **OPINION & ORDER**

   **CHIN, D.J**

   In this case, I find myself in the position of having my fairness and impartiality as a judge called into question

Case 1:15-mc-00363-DLC   Document 27   Filed 11/24/15   Page 58 of 74

Page 2
994 F. Supp. 447, *447; 1997 U.S. Dist. LEXIS 21963, **1

because of my race. After I ruled against their client at trial, respondents Larry Klayman, Esq. and Paul J. Orfanedes, Esq. directed a series of questions to me inquiring (1) whether I knew John Huang and Melinda Yee, individuals involved in the recent campaign finance controversy, and (2) whether I had had any "business, political or personal dealings" with them or any other "persons related in any way to the [**2] Clinton Administration." Respondents have since conceded on the record in open court that the questions were asked of me in part because of my race:

> THE COURT: You are standing there and you are telling me that you did not ask these questions of me because I am Asian-American, is that what you are telling me?

> MR. KLAYMAN: I'm saying that is part of it.

> THE COURT: You are conceding that that is part of it?

> MR. KLAYMAN: Part of it, yes. And I'm also asking the questions --

> THE COURT: You are conceding that you asked questions of the court, at least in part, because of my race?

> [*448] MR. KLAYMAN: In part. . . .

(12/19/96 Tr. at 8).

Respondents had absolutely no basis for posing such questions to the Court. Moreover, Mr. Klayman has engaged in other conduct disrespectful of the Court. For example, in the same hearing, after purporting to advise me of my obligations under the canons of judicial ethics, Mr. Klayman suggested that I "search [my] own soul." (12/19/96 Tr. at 14, 16).

Messrs. Klayman and Orfanedes are not members of the Bar of this Court. Rather, they were both granted the privilege of appearing pro hac vice. [1] Because of their conduct [**3] in this case, I issued an order directing them to show cause why they should not be sanctioned or disciplined for violating Disciplinary Rules 1-102(A)(5) and 7-106(C)(6). They retained counsel, who filed a written response on their behalf.

> 1  Mr. Klayman was admitted pro hac vice in November 1991 by Judge Kram and Mr. Orfanedes was admitted pro hac vice by me in November 1996.

Having reviewed the response as well as all the relevant parts of the record, and for the reasons set forth below, I find that respondents Larry Klayman, Esq. and Paul J. Orfanedes, Esq. have violated Disciplinary Rules 1-102(A)(5) and 7-106(C)(6). Consequently, they are disciplined as follows: (1) their admissions pro hac vice are hereby revoked; (2) any future applications by Messrs. Klayman and Orfanedes to appear before me on a pro hac vice basis will be denied; and (3) Messrs. Klayman and Orfanedes are hereby ordered to provide a copy of this opinion to any other judge in this District to whom they may make an application for admission [**4] pro hac vice in the future.

## STATEMENT OF THE CASE

### A. The Underlying Facts

Plaintiff Macdraw, Inc. ("Macdraw") [2] imports and sells wire-drawing equipment. In 1989, it agreed to sell certain equipment to Laribee Wire Manufacturing Company, Inc. ("Laribee") for a purchase price of approximately $ 7.1 million, to be paid in four installments. Because of the size of the transaction, Laribee approached defendant CIT Group Equipment Financing, Inc. ("CIT") for financing. CIT agreed to provide financing in return for a security interest in the equipment. Laribee was required, under the terms of the agreement, to meet certain conditions on a continuing basis. One such condition was that Laribee not be in default on any loans with other financial institutions.

Case 1:15-mc-00363-DLC   Document 27   Filed 11/24/15   Page 59 of 74

Page 3
994 F. Supp. 447, *448; 1997 U.S. Dist. LEXIS 21963, **4

2   Macdraw is now known as Samp U.S.A (Trial Tr. at 23), but for ease of reference I will simply refer to it as Macdraw.

Eventually, all of the equipment was delivered by Macdraw to Laribee. Consequently, CIT made the first three of the four [**5]  payments under the financing agreement directly to Macdraw, as instructed by Laribee, leaving only the fourth and final installment -- some $ 711,000 -- to be paid. In November 1990, Laribee acknowledged to CIT that it had "accepted" the equipment, clearing the way, from Macdraw's point of view, for the final payment. As CIT began processing the fourth installment, however, it learned that Laribee had defaulted on a loan with Bankers Trust. As a consequence, Laribee was in default under the financing agreement with CIT and CIT refused to release the final $ 711,000 to Macdraw. Laribee was not able to make the final payment itself. Hence, Macdraw was never paid the final $ 711,000.

**B. Prior Proceedings**

Macdraw commenced this action against CIT in August 1991, asserting five causes of action. Laribee was not named because it had filed for bankruptcy. Notwithstanding Laribee's inability to comply with the terms of its financing agreement with CIT, Macdraw contends that CIT was required to make the final $ 711,000 payment on Laribee's behalf because (1) defendant Richard Johnston purportedly made certain promises on CIT's behalf, and (2) CIT purportedly failed to disclose [**6]  to Macdraw that Laribee was in default and encountering financial problems. CIT denied the allegations.

In the fall of 1991, respondent Klayman advised the Court (Kram, D.J.) of his intention  [*449]  to move, on behalf of Macdraw, for summary judgment. Judge Kram sought to discourage Mr. Klayman from filing such a motion, to no avail, for in March 1992 Macdraw moved for partial summary judgment. On April 14, 1992, having failed to demand a jury trial on a timely basis, Macdraw also filed a motion for an order granting it a jury trial. Defendants thereafter cross-moved for summary judgment dismissing the complaint and seeking sanctions for Macdraw's purportedly frivolous motion practice.

By Memorandum Opinion and Order docketed January 18, 1994, Judge Kram: (1) denied plaintiff's motion for partial summary judgment; (2) denied plaintiff's request for a jury trial; (3) granted defendants' cross-motion to dismiss with respect to three of the five counts (leaving only the fraud and promissory estoppel claims for trial); and (4) granted defendants' cross-motion for sanctions.  *Macdraw, Inc. v. CIT Group Equip. Fin., Inc., 1994 U.S. Dist. LEXIS 363, 1994 WL 17952* (S.D.N.Y. Jan. 18, 1994). Among other things, Judge Kram [**7]  concluded "it is apparent that 'plaintiff's counsel engaged in little or no preliminary factual and legal investigation' before bringing its motion." Id. at *20 (quoting *Wrenn v. New York City Health & Hospitals Corp., 104 F.R.D. 553, 559 (S.D.N.Y. 1985))*. The Court imposed sanctions under Rule 11, which Macdraw's attorneys were ordered to pay.

At an earlier point in the proceedings, Mr. Klayman wrote the Court a letter requesting leave to file a motion for voluntary recusal, pursuant to *28 U.S.C. § 455(a)*, on the ground that "the Court 'has prejudged the case against the plaintiff.'" Id. at *20 (quoting Letter to Hon. Shirley Wohl Kram from Larry Klayman of 5/14/92). Judge Kram reminded the parties that the Court had the power to impose sanctions for bad faith, vexatious, wanton, or oppressive conduct and directed the parties to submit proposed briefing schedule for a recusal motion. Id. at *20. No such motion, however, was ever filed.

On January 5, 1995, Macdraw, Klayman, and Klayman's firm (Klayman & Associates) appealed the imposition of sanctions to the Second Circuit. In an opinion dated January 3, 1996, the Second Circuit reversed the award of sanctions.  [**8]  *Macdraw, Inc. v. CIT Group Equip. Fin., Inc., 73 F.3d 1253 (2d Cir. 1996)*. In doing so, however, the Second Circuit noted:

Our discussion should not be taken to suggest that we find the conduct of plaintiff's counsel throughout this litigation to be acceptable. Indeed, we note our sympathy with the district court's frustration; in

994 F. Supp. 447, *449; 1997 U.S. Dist. LEXIS 21963, **8

pursuing this appeal, plaintiff's counsel submitted briefs that included inaccurate characterizations of the record and comments that we consider entirely inappropriate. There is no question that our rules permit sanctions where an attorney's conduct degrades the legal profession and disserves justice. In the face of significant abuse, a district court need not hesitate to impose penalties for unreasonable conduct and acts of bad faith. Nevertheless, it must do so with care, specificity, and attention to the sources of its power. . . .

*Id. at 1262.*

While the appeal of the sanctions award was pending in the Second Circuit, Macdraw filed a "renewed motion" for a jury trial in the District Court. In the motion papers, signed by respondents Klayman and Orfanedes, respondents wrote:

Macdraw respectfully submits that the Court has demonstrated [**9] perhaps an unintentional, yet readily apparent, predisposition against its claims. As set forth below, the record in this matter raises legitimate cause for concern. In order to alleviate any such concern, and avoid even the appearance of judicial predisposition, Macdraw respectfully requests that the Court allow a jury trial so as to safeguard Macdraw's rights. . . .

(Pl. Mem. in Support of Renewed Motion for Jury Trial at 1). That motion was denied by Judge Kram on July 31, 1995. Thereafter, Macdraw filed with the Second Circuit a petition for a writ of mandamus directing the District Court to grant Macdraw a jury trial, which the Second Circuit denied on October 3, 1995.

By letter to Judge Kram dated October 30, 1995, Macdraw requested a stay of the case pending the filing of a petition for a writ of  [*450]  certiorari to the Supreme Court on the issue of Macdraw's right to a jury trial. On November 2, 1995, Judge Kram granted the application and the case was stayed pending the filing by Macdraw of a petition for certiorari.

On November 6, 1995, the case was re-assigned to me. Although it is not clear from the record whether Macdraw ever filed a petition for a writ of certiorari [**10]  with the Supreme Court, in the summer of 1996 Macdraw advised the Court that it was prepared to proceed to trial without a jury. I conferenced the case on September 3, 1996, at which time I directed the parties to be ready for trial in November 1996.

**C. The Trial**

After the submission of detailed trial briefs, the case was tried to the Court without a jury on November 6, 7, 12, and 13, 1996. Macdraw's principal witness was its president, Massimo Colella. After Macdraw rested, defendants moved for judgment as a matter of law and I reserved decision. (Trial Tr. at 302). Defendants proceeded to call two witnesses, including defendant Richard Johnston. At that point defendants renewed their motion for judgment as a matter of law, without resting. (Trial Tr. at 416). On November 12, 1996, I adjourned the trial so that I could complete my reading of the depositions before ruling on defendants' motion. (*Id. at 425-33*).

On November 13, 1996, I granted defendants' motion for judgment as a matter of law. Pursuant to Rule 52(c), I made findings of fact and conclusions of law. (Trial Tr. at 436-45). My decision turned largely on my credibility findings. Having heard both Johnston [**11]  and Colella testify, and having reviewed all the evidence in the case, I found Johnston to be more credible than Colella. I accepted Johnston's testimony that he never made the alleged oral promises and I rejected Colella's testimony to the contrary. (*Id. at 439-42*). I also found that Macdraw could not have reasonably believed that CIT would commit to disbursing $ 711,000 in additional financing without assuring itself that Laribee was still in sound financial condition. (*Id. at 444*).

**D. Respondents' Conduct**

994 F. Supp. 447, *450; 1997 U.S. Dist. LEXIS 21963, **11

Three aspects of respondents' conduct, taken together, led me to issue the order to show cause. They are: (1) comments made by Mr. Klayman at the conclusion of trial on November 13, 1996; (2) the questions contained in a letter dated December 9, 1996, signed by both Messrs. Klayman and Orfanedes; and (3) comments made by Mr. Klayman at a conference I held on December 13, 1996, after receiving the December 9th letter. I will review each in detail.

**1. The November 13, 1996 Comments**

After I stated my findings and conclusions at the conclusion of the trial on November 13, 1996, Mr. Klayman expressed a desire to make post-trial motions. A colloquy [**12]  with the Court ensued (Trial Tr. at 445-52), concluding with the following:

> [THE COURT TO MR. KLAYMAN:] I am not going to debate this with you. I have ruled. . . .
>
> I really don't think any additional motions are really going to help. All I am suggesting to you is that I think your view of the evidence is very different from my view of the evidence and that's fine. You have to do your job. If you want to make any motions, go ahead and make your motions, but I am not going to require any responses from CIT until I look at the motions first.
>
> MR. KLAYMAN: Your Honor, I understand your position and I understand you have denied the motions. We will simply file a notice of appeal. But I had to say that for the record. We are not here 6 years later because we wanted to be. You are newly appointed to the bench, we are aware of the fact that you did speed this case to trial. We hope in the future this court functions better because frankly it has not functioned well --
>
> THE COURT: Mr. Klayman, that is totally out of line. I don't know what you are doing now. I have no history with you.
>
> MR. KLAYMAN: What I am telling you is, you criticized us for being 6 years later [**13]  into this case and I am pointing out that  [*451]  we would have liked to have tried this case a lot sooner, period. I'm not trying to embarrass you or anybody else.
>
> THE COURT: Believe me, you are not embarrassing me. This case is five or six years old for whatever the reason. When it came to me I moved it very quickly. Your client got his day in court. That's it. For you to stand there and criticize the court gets you nowhere. I just don't understand why you are doing that. How does it help you to stand there and criticize the court?
>
> MR. KLAYMAN: Because I am an officer of the court and I take it seriously. And criticism goes both ways. There is a *First Amendment*, your Honor.
>
> THE COURT: Mr. Klayman, is there anything else you want to say?
>
> MR. KLAYMAN: No.
>
> THE COURT: Then this case is over.

(Trial Tr. at 451-52) (emphasis added).

**2. The December 9, 1996 Letter**

Unfortunately, however, the case was not over. Some four weeks later, I received a letter, dated December 9, 1996 (the "December 9th Letter"), addressed to me and signed by both Messrs. Klayman and Orfanedes, which stated in part:

Case 1:15-mc-00363-DLC    Document 27    Filed 11/24/15    Page 62 of 74

Page 6

994 F. Supp. 447, *451; 1997 U.S. Dist. LEXIS 21963, **13

   Finally, as you may know, Mr. Orfanedes and I have been [**14] involved in very highly publicized and significant public interest litigation, *Judicial Watch, Inc. v. U.S. Department of Commerce*, Case No. 95-0133 (RCL) (D.D.C.), which involves a Mr. John Huang, Ms. Melinda Yee and other persons in the Asian and Asian-American communities. *See* Exhibit 1. Recently, we came upon a document in this case which mentions your name in the context of other prominent Asian-American appointees of the Clinton Administration. *See* Exhibit 2. Accordingly, could you please formally advise us whether you know either of these individuals, as well as what relationship, contacts, and/or business, political or personal dealings, if any, you have had with them, or persons related in any way to the Clinton Administration. Please also advise us if you had seen the enclosed or similar newspaper articles or press accounts before this case was tried on November 6, 7, 12 and 13, 1996.

Attached as Exhibit 1 to the December 9th Letter were eight articles from magazines and newspapers reporting on the recent controversy regarding John Huang, the Democratic National Committee, and campaign contributions. Mr. Klayman is mentioned in some of the articles. Exhibit [**15] 2 to the December 9th Letter is a computer-generated print-out of a newspaper or magazine article that appeared on November 4, 1994, more than two years ago, in which certain presidential appointments of Asian-Americans are listed, including John Huang and myself.

### 3. The December 19, 1996 Comments

   After receiving the December 9th Letter, I directed counsel to appear for a conference at which I asked respondents to explain the basis on which they felt it was appropriate to ask me the questions contained in their Letter. Mr. Klayman spoke on their behalf and articulated the view that they asked the questions because: (1) they felt I had made some comments directed toward them that were critical and "in some way personal"; (2) they were involved in a case against the Commerce Department and the Clinton Administration in which they had been accused of being biased against the Asian-American community; and (3) I was a recent appointee of the Clinton Administration and had been actively involved, prior to taking the bench, with the Asian American Legal Defense and Education Fund and the Asian American Bar Association of New York. (12/19/96 Tr. at 4-9). Mr. Klayman then said the [**16] following to me:

   I frankly felt, and Mr. Orfanedes frankly felt, that the remarks in some way were personal, and we are concerned, as advocates on behalf of our client, given the unusual nature of this case concerning Mr. Huang, that somehow subjectively this did not in any way influence you or perhaps have you view me negatively or Mr. Orfanedes.

(12/19/96 Tr. at 6).

   To the extent there was any doubt that the questions in respondents' December 9th Letter were asked of me in part because of my [*452] race, that doubt was eliminated by Mr. Klayman's responses to my questions:

   THE COURT: . . .

   What I hear is that you are asking questions of me because you have some questions about my fairness and impartiality because of my race. Is that not so?

   MR. KLAYMAN: No, that's not so, your Honor.

   THE COURT: Would you have asked me these questions if I were not Asian-American?

   MR. KLAYMAN: I might have.

   . . .

   THE COURT: You would have asked me these questions if I were Caucasian or African-American?

994 F. Supp. 447, *452; 1997 U.S. Dist. LEXIS 21963, **16

MR. KLAYMAN: Let me tell you why I might have. And I don't see any harm in asking these questions because I have a duty to a client.

THE COURT: Did [**17] your client ask you to ask these questions of me?

MR. KLAYMAN: My client is aware of the general issues. They did not ask me to ask these questions of you.

Frankly, your Honor, given whatever your response may be, I don't know that there's any issue here at all, but I felt that asking the question was something that would be prudent and wise and part of my responsibility to represent our client zealously within the balance of the law.

It's not your race. I myself am a minority. I myself have been subject to discrimination. I am sensitive to that.

THE COURT: You are standing there and you are telling me that you did not ask these questions of me because I am Asian-American, is that what you are telling me?

MR. KLAYMAN: I'm saying that is part of it.

THE COURT: You are conceding that that is part of it?

MR. KLAYMAN: Part of it, yes. And I'm also asking the questions --

THE COURT: You are conceding that you asked questions of the court, at least in part, because of my race?

MR. KLAYMAN: In part. And let me tell you why. And I would [have] asked questions because you're also a recent appointee of the Clinton Administration. Has nothing to do with [**18] it. But you have been active, your Honor, for instance, in these kinds of efforts. And I commend you for your activity on behalf of Asian-Americans, with regard to the Asian-American Legal Defense Fund and being a president of the Asian-American Bar Association. I myself have been active in similar types of things and am fully supportive of those activities.

But we are all human, and sometimes, sometimes subjective criteria can unwittingly, no matter how ethical, no matter how decent, no matter how honest someone is -- and we believe you to be that -- they can subjectively influence our decision-making. I, for instance, would not sit as a Jewish American on a case that involved a Palestinian. I wouldn't do it if I was a judicial officer just because of a lot of things which enter into the subjectivity of all our thinking.

I'm not making any accusations, but I felt that I had a right, given what --

THE COURT: Based on what? Based on what did you have that right?

MR. KLAYMAN: Representing the client. We live in the real world, your Honor. People are influenced by subjective criteria.

(12/19/96 Tr. at 7-9).

Mr. Klayman articulated the view that he was simply asking [**19] questions of the Court, that he was not making accusations, and that there was no harm in asking the questions. (12/19/96 Tr. at 9-12). Mr. Orfanedes spoke briefly and stated that he did not "see this as necessarily race-based." (Id. at 12). Mr. Klayman then purported to advise me on the canons of judicial ethics (id. at 14) and eventually suggested that I "search [my] own soul":

Case 1:15-mc-00363-DLC   Document 27   Filed 11/24/15   Page 64 of 74

Page 8

994 F. Supp. 447, *452; 1997 U.S. Dist. LEXIS 21963, **19

[MR. KLAYMAN:] Now, I believe your Honor has to search his own soul to a large extent. There may be independent legal requirements here on whether or not you wish to advise this court of some of the questions which we asked, which are benign, [*453] which were posed in a very respectful way. We ask that this letter [the December 9th letter] be made part of the court record.

THE COURT: The letter has already been docketed. I am not going to search my soul. I do not need to do any soul searching at all. The letter is offensive. I find the letter to be offensive. I do not think it is benign nor do I think it is respectful. Not at all.

MR. KLAYMAN: I take it your Honor is not going to respond to the questions.

THE COURT: I am not going to respond to your questions. I have heard no [**20] basis that would give me any reason to answer your questions.

(12/19/96 Tr. at 16).

### E. The Order To Show Cause

On January 10, 1997, in accordance with General Rule 4 of the Court, and in particular paragraphs (f), (g), and (k) thereof, I ordered Messrs. Klayman and Orfanedes to show cause why they should not be sanctioned or disciplined for violating Disciplinary Rules 1-102(A)(5) and 7-106(C)(6) by their conduct in this case on November 13, 1996 and December 19, 1996 and their December 9th Letter.

Respondents retained counsel, who submitted a letter brief dated January 24, 1997 (the "Letter Brief") on respondents' behalf. In the Letter Brief, respondents essentially argue that their conduct could not prejudice the administration of justice or degrade a tribunal. In addition, respondents contend that they acted reasonably in sending the December 9th Letter because of the "notoriety" surrounding their lawsuit against the Department of Commerce, which focused on "a prominent Presidential appointee, John Huang, who is Asian-American," their involvement in the lawsuit, and what they believed to be my hostility toward them personally. (Letter Br. at 5-6). The Letter [**21] Brief further states:

Mr. Klayman and Mr. Orfanedes became concerned that because the Court was a recent appointee of President Clinton and Mr. Huang was a principle [sic] advisor on Asian-American appointments and fund raising and Mr. Klayman had been prominently mentioned in the media for his role in the Commerce Department case, which focused in part on the White House, the Democratic National Committee, John Huang, Melinda Yee, and other persons in the Asian and Asian-American communities, and because the lawsuit had elicited such angry responses from the White House, Democrats and the Asian-American community, that the Court might be angry at them and unable to be fair and impartial in a case in which they were counsel. . . .

(Letter Br. at 8-9) (emphasis added). Respondents also contend in the letter that they did not ask the questions because of any concern that I was biased because of my race, and state that they "strive to be free of racial prejudice and believe they are." (Letter Br. at 10-11).

Finally, respondents contend in the Letter Brief that no further action is required, but that if the Court believes otherwise, "further identification of the issues, [**22] facts and law involved would be necessary." In that event, they request that the matter be referred to another judge of this Court. (Letter Br. at 12-13).

## DISCUSSION

### A. Procedural Issues

994 F. Supp. 447, *453; 1997 U.S. Dist. LEXIS 21963, **22

Rule 4 of the General Rules of this Court governs the discipline of attorneys. Attorneys are entitled to notice and an opportunity to be heard. Gen. Rule 4(f). If, after such notice and opportunity, they are found guilty by clear and convincing evidence of violating the Code of Professional Responsibility, they may be disciplined. Id. In the case of an attorney admitted pro hac vice, discipline may include censure, suspension, or an order "precluding the attorney from again appearing at the bar of this court." Gen. Rule 4(g). In addition, "upon the entry of an order of preclusion, the clerk shall transmit to the court or courts where the attorney was admitted to practice a certified copy of the order, and of the court's opinion, if any." Id.

 [*454]  Where misconduct occurs in the presence of a judge of this Court or "in respect to any matter pending in this Court," the matter "may be dealt with directly by the judge in charge of the matter or at said judge's option referred to [**23]  the committee on grievances, or both." Gen. Rule 4(k).

Here, respondents raise three procedural issues: (1) whether further action is required; (2) if so, whether the proceedings should be delayed for "further identification of the issues, facts and law"; and (3) whether the matter should be referred to another Judge of the Court. (Letter Br. at 12-13).

As to the first procedural issue, for the reasons stated herein, I believe further action is required.

As to the second procedural issue, respondents have been provided with notice and an opportunity to be heard. Indeed, they were given two opportunities to explain why they asked the questions contained in the December 9th Letter. Moreover, my order to show cause specified that I was concerned about their conduct on November 13 and December 19, 1996 and their December 9th Letter, and it further specified the two Disciplinary Rules that I believed were implicated. Hence, there is no need for "further identification of the issues, facts and law involved."

Finally, as to the third procedural issue, respondents request that the matter be referred to another Judge of this Court. The misconduct, however, occurred both in my presence and [**24]  "in respect to" a matter pending before me. Thus, I have the option of dealing with the matter "directly." I choose to do so.

**B. The Applicable Disciplinary Rules**

Two Disciplinary Rules of the Code of Professional Responsibility (see Appendix to N.Y. Judiciary Law (McKinney 1992 & Supp. 1997)) must be considered. They are DR 1-102(A)(5) and DR 7-106(C)(6).

DR 1-102(A)(5) provides that:

A lawyer shall not . . . engage in conduct that is prejudicial to the administration of justice.

Disciplinary Rule 7-106(C)(6) provides that:

In appearing as a lawyer before a tribunal, a lawyer shall not . . . engage in undignified or discourteous conduct which is degrading to a tribunal.

Hence, the issue presented is whether the record shows, by clear and convincing evidence, that respondents engaged in conduct that was "prejudicial to the administration of justice" or that was "undignified or discourteous" and "degrading to a tribunal."

Fortunately, the case law on the subject of whether attorneys violated their ethical obligations by their conduct toward courts is sparse. It is clear, however, that attorneys who engage in disrespectful conduct against [**25]  courts are subject to discipline.

For example, in *In re Evans, 801 F.2d 703 (4th Cir. 1986)*, cert. denied, *480 U.S. 906, 94 L. Ed. 2d 520, 107 S. Ct. 1349 (1987)*, an attorney was disbarred by the district court for accusing a magistrate judge of either being incompetent

Case 1:15-mc-00363-DLC   Document 27   Filed 11/24/15   Page 66 of 74

Page 10

994 F. Supp. 447, *454; 1997 U.S. Dist. LEXIS 21963, **25

or having a "Jewish bias" in favor of an adversary. *801 F.2d at 704*. The district court found that the attorney had, by his conduct, violated DR 1-102(A)(5), 7-106(C)(6), and 8-102(B). [3] *Id. at 705*.

> 3   DR 8-102(B) prohibits a lawyer from making false accusations against a judge. Respondents have disavowed that they were making any accusations against me. Although the point is debatable, I have chosen not to invoke DR 8-102(B).

The attorney appealed, and the Fourth Circuit affirmed, concluding, among other things, that the attorneys' accusations against the magistrate of incompetence and religious and racial bias were "unquestionably undignified, discourteous, and degrading." *Id. at 706*. Moreover, the Fourth Circuit found that [**26] because the accusations were made while the underlying case was on appeal, the district court properly viewed the accusations as "an attempt to prejudice the administration of justice in the course of the litigation." Id.

In *People ex rel. Chicago Bar Ass'n v. Metzen, 291 Ill. 55, 125 N.E. 734 (Ill. 1919)*, an attorney was disbarred for writing a letter to a judge stating that the attorney "was usually  [*455]  engaged in dealing with men and not irresponsible political manikins or appearances of men." *125 N.E. at 735*. The Illinois Supreme Court wrote:

> Judges are not exempt from just criticism, and whenever there is proper ground for serious complaint against a judge, it is the right and duty of a lawyer to submit his grievances to the proper authorities, but the public interest and the administration of the law demand that the courts should have the confidence and respect of the people. Unjust criticism, insulting language, and offensive conduct toward the judges personally by attorneys, who are officers of the court, which tend to bring the courts and the law into disrepute and to destroy public confidence in their integrity, cannot be permitted.

*Id. at 735*.  [**27]  See also *In re Greenfield, 24 A.D.2d 651, 262 N.Y.S.2d 349, 350* (2d Dep't 1965) (suspending one attorney and disbarring another for writing a letter to a judge falsely accusing the judge of misconduct in office); *Kentucky Bar Ass'n v. Williams, 682 S.W.2d 784, 786 (Ky. 1984)* (suspending attorney for three months for deliberately failing to appear for court appearance and for writing disrespectful letter to the trial judge and holding "deliberately disrespectful actions toward the judiciary cannot help but tend to bring Bench and Bar into disrepute").

The source of a court's power to discipline an attorney for misconduct is clear. As the Supreme Court has held,

> Courts have long recognized an inherent authority to suspend or disbar lawyers. . . . This inherent power derives from the lawyer's role as an officer of the court which granted admission.

*In re Snyder, 472 U.S. 634, 643, 86 L. Ed. 2d 504, 105 S. Ct. 2874 (1985)*; accord *In re Jacobs, 44 F.3d 84, 87 (2d Cir. 1994)* ("A district court's authority to discipline attorneys admitted to appear before it is a well-recognized inherent power of the court."), cert. denied, *516 U.S. 817, 116 S. Ct. 73, 133* [**28] *L. Ed. 2d 33 (1995)*; *People ex rel. Karlin v. Culkin, 248 N.Y. 465, 470-71, 162 N.E. 487 (1928)* ("'Membership in the bar is a privilege burdened with conditions.' [An attorney is] received into that ancient fellowship for something more than private gain. He [becomes] an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice.") (citations omitted). This power extends as well to out-of-state attorneys who are granted the privilege of appearing pro hac vice: "Just as with a regularly admitted attorney, one seeking admission pro hac vice is subject to the ethical standards and supervision of the court." *In re Rappaport, 558 F.2d 87, 89 (2d Cir. 1977)*; see also *Leis v. Flynt, 439 U.S. 438, 441-42, 58 L. Ed. 2d 717, 99 S. Ct. 698 (1979)* (ability of an out-of-state attorney to appear pro hac vice is a "privilege" and "not a right granted either by statute or the Constitution").

## C. Respondents' Conduct

I find, by clear and convincing evidence, that respondents, and in particular Mr. Klayman, engaged in undignified and discourteous conduct that was both degrading to the Court and prejudicial to the administration [**29] of justice. That conduct includes the following:

### 1. The November 13, 1996 Comment

Mr. Klayman stated on November 13, 1996 that "we hope in the future this court functions better because frankly it has not functioned well . . . ." (Trial Tr. at 451). This comment was undignified, discourteous, and degrading to the Court. Although respondents now contend that this comment "was not referring to the period after the case was reassigned," nonetheless, the comment was not made in a constructive manner and was degrading to the Court as a whole. (Letter Br. at 3).

In fact, a review of the court file shows that whatever delay there was in the case was largely attributable to Macdraw and its counsel. For example, Macdraw did not make a timely jury demand; as a consequence, it filed a motion for a jury trial, a renewed motion for a jury trial, a petition for a writ of mandamus requiring the district court to grant a jury trial, and a petition for rehearing en banc -- all of which were unsuccessful. Ultimately, Macdraw requested and was granted a stay of the proceedings so that it could file a petition for certiorari to the [*456] Supreme Court. In addition, although it had no realistic [**30] chance of winning a summary judgment motion as the plaintiff in a case that turned on a disputed oral promise, it nonetheless filed such a motion, which led to a cross motion for sanctions and further litigation, including appellate litigation. All of these actions -- as well as others by Macdraw and its attorneys -- served to prolong the proceedings.

### 2. The December 9th Letter

The questions contained in the December 9th Letter were inappropriate and were asked in an undignified and disrespectful manner. They were asked, as respondents concede, in part because I am Asian-American. They were asked because respondents were concerned that because I had been active with the Asian American Legal Defense and Education Fund and the Asian American Bar Association of New York before I took the bench and they had been involved in litigation that involved some individuals who happened to be Asian-American, I "might be angry at them and unable to be fair and impartial in a case in which they were counsel." (Letter Br. at 8-9).

In essence, respondents were suggesting that a judge might be "angry" at them and therefore unable to treat them fairly merely because (1) the judge was Asian-American [**31] and (2) they were involved in what some apparently have perceived to be "anti-Asian" litigation. This sentiment is absurd and demeans me individually and the Court as a whole. In fact, I was not aware, until it was brought to my attention in the December 9th Letter, that Mr. Klayman and Mr. Orfanedes had any connection to any litigation involving the John Huang fund-raising controversy.

Mr. Klayman's comment that if he were a "judicial officer" he "would not sit as a Jewish American on a case that involved a Palestinian" (12/19/96 Tr. at 9) is most telling. Judges cannot recuse themselves solely on the basis of their race or religion or the race or religion of the attorneys or parties who come before them. As Judge Motley wrote more than 20 years ago in denying a motion for her recusal in a sex discrimination case brought by a female attorney against a law firm:

It is beyond dispute that for much of my legal career I worked on behalf of blacks who suffered race discrimination. I am a woman, and before being elevated to the bench, was a woman lawyer. These obvious facts, however, clearly do not, ipso facto, indicate or even suggest the personal bias or prejudice required [for [**32] recusal]. The assertion, without more, that a judge who engaged in civil rights litigation and who happens to be of the same sex as a plaintiff in a suit alleging sex discrimination on the part of a law firm, is, therefore, so biased that he or she could not hear the case, comes nowhere near the standards required for recusal. Indeed, if background or sex or race of each judge were, by definition, sufficient grounds for removal, no judge on this court could hear this case, or many others, by virtue of

Case 1:15-mc-00363-DLC   Document 27   Filed 11/24/15   Page 68 of 74

Page 12

994 F. Supp. 447, *456; 1997 U.S. Dist. LEXIS 21963, **32

the fact that all of them were attorneys, of a sex, often with distinguished law firm or public service backgrounds.

*Blank v. Sullivan & Cromwell, 418 F. Supp. 1, 4 (S.D.N.Y. 1975).* See also *Commonwealth of Pennsylvania v. Local Union 542, IUE, 388 F. Supp. 155, 163 (E.D. Pa.), aff'd, 478 F.2d 1398 (3d Cir. 1974),* cert. denied, *421 U.S. 999 (1975)* (Higginbotham, J.) (denying defendant's motion to disqualify judge from hearing race discrimination claim, on basis of his race and comments he made in speech to "group composed of black historians," and holding "that one is black does not mean, ipso facto, that he is anti-white; no more than being Jewish implies being [**33] anti-Catholic, or being Catholic implies being anti-Protestant").

### 3. The December 19, 1996 Comments

Mr. Klayman's lack of respect for the Court continued on December 19, 1996. After he admitted that the questions in the December 9th Letter were asked of me in part because of my race (12/19/96 Tr. at 7-9), he presumed to advise me on my ethical obligations under the canons of judicial ethics. (*Id. at 14, 16-17*). He took it upon himself to suggest that "your Honor has to search his own soul to a large extent." (*Id.* [*457] *at 16*). These comments went beyond mere arrogance and foolishness and were undignified, discourteous, and degrading to the Court.

### D. Respondents' Claim of Hostility

In an effort to rationalize their behavior, respondents contend that they were concerned about my fairness and impartiality because comments that I made led them to believe that I "had become hostile to them personally." (Letter Br. at 6). They cite to a number of specific instances, including my reference to their "abusive and onerous [sic] questioning in the depositions" (Letter Br. at 6 (citing Trial Tr. at 444)); my characterization of one of plaintiff's theories as "preposterous" [**34] (id.); my reliance on the failure of Macdraw to have made a demand on CIT before bringing suit (id.); my reaction to plaintiff's stated intention to file post-trial motions and my reference to plaintiff's attorneys' fees (*id. at 448*). To the extent I expressed any impatience, it was not due to any personal bias against respondents; rather, it was the result of a bias against questionable lawyering, the taking of specious positions, and the wasting of resources of the parties and the Court.

### 1. The Depositions

Respondents complain that "the Court spoke of 'very abusive and onerous questioning in the depositions' by plaintiff's counsel without identifying it." (Letter Br. at 6 (citing Trial Tr. at.444)). Not only is my statement misquoted, it is also taken out of context. The complete and accurate statement was as follows:

> I also note, by the way, that having read the depositions I am convinced that there was no effort on the part of CIT to defraud Macdraw or even to take advantage of Macdraw. To the contrary, I found the CIT witnesses to be frank and forthright in the face of some very abusive and obnoxious questioning in the depositions.

(Trial [**35] Tr. at 444) (emphasis added). Moreover, Mr. Klayman's questioning at the depositions was indeed "abusive and obnoxious" at times. For example, at the deposition of John Zakoworotny, he stated to the witness: "It [the question] calls for a yes or no. Don't play around with the questions. Give me a yes or no. . . . Tell me yes or no. This is not an exercise in your evading my question." (Zakoworotny Dep. at 67-68). When the witness later stated that he could not answer a question about a document based on his "initial review," Mr. Klayman responded: "You want to review it more thoroughly? Read it five times." (*Id. at 78*). When the witness tried to answer another question by providing an explanation, Mr. Klayman chastised him as follows:

> Just answer the question. I think you've had too much preparation. Just answer the question. And I put "preparation" in quotes. You're tied like a pretzel. Just answer the question.

Case 1:15-mc-00363-DLC   Document 27   Filed 11/24/15   Page 69 of 74

Page 13

994 F. Supp. 447, *457; 1997 U.S. Dist. LEXIS 21963, **35

(*Id. at 81-82*). There are numerous other examples. (See, e.g., Zakoworotny Dep. at 44-45, 56-57, 60-61, 67-68, 71, 83, 86, 90-91, 97; Swallwell Dep. at 21-22, 40-41).

### 2. Plaintiff's "Preposterous" Claim

I did describe one of Macdraw's [**36] theories as being "preposterous" (Trial Tr. at 444), and indeed it was. Macdraw was contending that a relatively low-level employee, who had been employed by CIT at that point for only five months, was conspiring with others at CIT to cheat Macdraw by lulling it into providing services to Laribee to enhance the value of equipment that CIT could later seize as security and re-sell at a higher price when Laribee defaulted. The only motive that Macdraw could offer for why Johnston would engage in this conspiracy to defraud was that he hoped to improve his chances of being promoted. The notion that a low level employee would see perpetuating a fraud as a means to obtain a promotion is indeed preposterous.

### 3. The Absence of a Demand

In my findings of fact and conclusions of law, I observed that "it is also significant that Macdraw never, prior to this lawsuit, ever made a demand on CIT or communicated its belief that CIT had made a promise or guarantee that it refused to honor." (Trial Tr. at 444). Respondents claim that this observation further demonstrates my hostility [*458] toward them because my observation (1) was purportedly based on "an error of fact," citing PX 133, and (2) [**37] in any event was "irrelevant." (Letter Br. at 6). Respondents are wrong in both respects.

First, PX 133 hardly constitutes a "demand" letter or a communication from Macdraw to CIT setting forth a claim that CIT had made a promise or guarantee that it refused to honor. Rather, the January 29, 1991 letter from counsel for Macdraw simply asks Mr. Zakoworotny of CIT to "contact [the attorney] regarding certain issues that [Macdraw] needs to address promptly regarding the balance due." (PX 133). In contrast, Mr. Colella, the President of Macdraw, testified in response to the Court's questions that Macdraw had not communicated to CIT, before bringing the lawsuit, its belief that CIT had made and failed to honor such a promise. (Trial Tr. at 145-46; see also *id. at 142-43*). Hence, the record shows that no demand was made prior to suit being filed.

Second, the issue of whether Macdraw had made its view known to CIT before the filing of suit was relevant. Macdraw's failure to make such a demand supports CIT's contention that the claim lacks any merit and that, as a factual matter, Macdraw did not actually believe that any promise had been made by CIT to Macdraw. Significantly, when [**38] CIT's counsel commenced this line of inquiry on cross-examination of Mr. Colella, Macdraw's counsel did not object. (Trial Tr. at 142-46).

### 4. Post-Trial Motions and Attorneys' Fees

Respondents also find evidence of my "hostility" toward them in my response to their stated desire to make post-trial motions and my comments on what they describe as "irrelevant issues like the reasonableness of their attorneys fees." (Letter Br. at 6). Apparently to show the reasonableness of their fees, respondents point to the fact that defendants incurred some $ 355,654 in legal fees. (*Id. at 7*)

My comments, however, reflect no bias. First, the issue of Macdraw's attorneys' fees was raised on cross-examination of Mr. Colella. Again, there was no objection to this line of inquiry. (Trial Tr. at 173-74). Second, my concern was not with whether the fees that Macdraw had already paid were reasonable for the services rendered or whether services were actually rendered. Rather, I was concerned that Macdraw had already spent more than $ 300,000 on a claim that, in my view, never had much chance of succeeding. I was also concerned that $ 300,000 in fees had been spent on a claim based on CIT's [**39] refusal to provide $ 711,000 in financing. Furthermore, I was concerned that Macdraw would be billed even more fees for post-trial motions that had little, if any chance of success -- indeed, post-trial motions in a non-jury case in which detailed pre-trial briefs had been filed (see Trial Tr. at 8-9) and where the outcome had turned almost entirely on issues of credibility. Indeed, my comments were made in the following context:

Case 1:15-mc-00363-DLC   Document 27   Filed 11/24/15   Page 70 of 74

Page 14

994 F. Supp. 447, *458; 1997 U.S. Dist. LEXIS 21963, **39

MR. KLAYMAN: I understand your Honor's decision, and I'm not going to use that forum as an opportunity to re-argue that. We will be moving with post-trial motions accordingly. We feel that your Honor will have an open mind once you have had a chance to look at this in a full perspective.

THE COURT: What post-trial motions are we talking about? This case has gone on for 5 years. This [is] not a jury case where I have to consider if there was evidence to support the jury's verdict. I'm not going to grant any post-trial motions.

I granted the defendants' motion for judgment as a matter of law. What motions do you propose to make? One of the things that troubles me, frankly, is Mr. Colella testified that he spent $ 300,000 in legal fees on [**40] this case. Frankly, I don't understand it. . . .

(Trial Tr. at 447-48).

The fact that CIT also spent some $ 355,000 in fees certainly does not help respondents. If anything, by the time this case is completed, the parties together would have spent more in legal fees than the $ 711,000 in financing in question.

[*459] **E. The Administration of Justice**

In determining whether respondents have engaged in improper conduct, it is important to consider two issues that are raised by their arguments: First, to what extent do lawyers have an obligation to question the impartiality of judges? Second, what harm is there in asking?

Lawyers do have an obligation to inquire when they have a reasonable basis for believing that a judge might not be fair and impartial. But there must be a reasonable basis. *In re Evans, 801 F.2d 703, 705-06 (4th Cir. 1986)*, cert. denied, *480 U.S. 906, 94 L. Ed. 2d 520, 107 S. Ct. 1349 (1987)*; *People ex rel. Chicago Bar Ass'n v. Metzen, 291 Ill. 55, 125 N.E. 734, 735 (Ill. 1919)*. And where there is a reasonable basis for doing so, there is no harm in asking -- as long as the "asking" is done in a discreet, dignified, and respectful way. If [**41] a lawyer has a reasonable basis for inquiring about a judge's ability to be impartial, the attorney might, for example, request a pretrial conference to explain the circumstances and to ask the Court whether the Court believes there is any reason it ought not to hear the particular case. But where there is no reasonable basis for questioning a judge's impartiality, or where the questioning is done in an undignified and disrespectful manner, there is harm in asking, for the integrity of the Court is challenged, the administration of justice is prejudiced, and both the bar and the bench are degraded.

Here, respondents had no reasonable or good faith basis to question my fairness and impartiality. Rather than acknowledge that fact and apologize for their actions, they instead have resorted to mischaracterizing and misrepresenting the record in an effort to justify their actions. The record does not, however, provide the justification they seek.

Moreover, instead of raising the issue discreetly and respectfully, they confronted me with what was tantamount to a series of written interrogatories, including: "could you please formally advise us whether you know either of these individuals, [**42] as well as what relationship, contacts and/or business, political or personal dealings, if any, you have had with them, or persons related in any way to the Clinton Administration." They asked for my "immediate attention to this matter," and noted that a deadline was approaching for any post-trial motions. This was followed by further disrespectful conduct, including urging me to "search [my] own soul."

Significantly, Mr. Klayman has a history of accusing judges of bias or prejuding cases. In this case, although he claims they are not accusations, he has raised questions about my ability to be fair. He accused Judge Kram of prejudging the case against plaintiff and of having "perhaps an unintentional, yet readily apparent, predisposition against its claims." And in 1992, in a case in the United States District Court for the Central District of California, Mr. Klayman accused a judge of being anti-Asian and anti-semitic and having "prejudged" the case. See *Baldwin Hardware*

Case 1:15-mc-00363-DLC   Document 27   Filed 11/24/15   Page 71 of 74

Page 15

994 F. Supp. 447, *459; 1997 U.S. Dist. LEXIS 21963, **42

*Corp. v. Franksu Enter. Corp., 78 F.3d 550, 555* (Fed. Cir.), cert. denied, *136 L. Ed. 2d 251, 117 S. Ct. 360 (1996)*. Mr. Klayman's repeated efforts to find fault with the judges before whom he appears certainly interferes [**43] with the administration of justice. Cf. *In re Snyder, 472 U.S. 634, 647, 86 L. Ed. 2d 504, 105 S. Ct. 2874 (1985)* ("a single incident of rudeness or lack of professional courtesy . . . does not support a finding of contemptuous or contumacious conduct, or a finding that a lawyer is 'not presently fit to practice law in the federal courts'").

Mr. Klayman has also been sanctioned on prior occasions, including by Judge Kram in this case. Although the Second Circuit reversed the award of sanctions (largely on procedural grounds), it noted in its opinion that "in pursuing this appeal, plaintiff's counsel submitted briefs that included inaccurate characterizations of the record and comments that we consider entirely inappropriate." *73 F.3d at 1262.*

Mr. Klayman was also sanctioned in the Baldwin case in 1992. The trial judge, because of his belief that Mr. Klayman had acted in bad faith and made certain misrepresentations, permanently and prospectively barred Mr. Klayman from appearing before him again pro hac vice and required him to attach a copy of the court's order to any future pro hac vice application in that court.  [*460] *78 F.3d at 561-62.* In particular, the trial judge found that [**44] Mr. Klayman had represented to the court, when he applied for admission pro hac vice, that he had never been sanctioned before when, in fact, his former firm, Klayman & Gurley, P.C., had been sanctioned in a matter handled by Mr. Klayman and two other attorneys at the firm. *Id. at 562.* The Federal Circuit affirmed, holding, among other things, that the trial judge had not abused his discretion in finding misconduct on the part of Mr. Klayman and his firm. Id.

Mr. Klayman and his current firm were also sanctioned $ 1,500 in *Wire Rope Importers' Ass'n v. United States, 18 C.I.T. 478, 1994 WL 235620* (Ct. Int'l Tr. 1994), for making a "frivolous" filing and for raising arguments that "stood no chance of success." Id..

Mr. Orfanedes is certainly less culpable than Mr. Klayman. The comments about which I am concerned were made not by him but by Mr. Klayman. Moreover, Mr. Orfanedes does not appear to have a history of this type of conduct as does Mr. Klayman. Nonetheless, Mr. Orfanedes signed the letter, was present when Mr. Klayman made the comments, and effectively joined in them. Hence, he must be held accountable as well.

**CONCLUSION**

As noted above, in reversing [**45] the prior award of sanctions against plaintiffs' counsel in this case, the Second Circuit wrote:

> There is no question that our rules permit sanctions where an attorney's conduct degrades the legal profession and disserves justice. In the face of significant abuse, a district court need not hesitate to impose penalties for unreasonable conduct and acts of bad faith.

*73 F.3d at 1262.* Respondents have engaged in significant abuse, unreasonable conduct, and acts of bad faith. Their conduct has degraded the legal profession and disserved justice.

Accordingly, it is hereby ORDERED as follows:

(1) the admissions of Larry Klayman, Esq. and Paul J. Orfanedes, Esq. pro hac vice are hereby revoked; hence, if there are any further proceedings in this case in this Court, Macdraw will be required to retain new counsel;

(2) any future applications by Messrs. Klayman and Orfanedes to appear before me on a pro hac vice basis will be denied;

(3) Messrs. Klayman and Orfanedes shall provide a copy of this opinion to any other judge in this District to whom

994 F. Supp. 447, *460; 1997 U.S. Dist. LEXIS 21963, **45

they may make a future application for admission pro hac vice; and

(4) The Clerk of the Court shall transmit to the courts where [**46] Messrs. Klayman and Orfanedes are admitted (as set forth in their applications for admission pro hac vice) a certified copy of this Opinion and Order.

SO ORDERED.

Dated: February 5, 1997

New York, New York

DENNY CHIN

United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

DENNIS L. MONTGOMERY

                  Plaintiff,

       v.

SIMON & SCHUSTER,

and

PRISCILLA PAINTON,

and

TINA BENNETT,

                  Defendants.

Miscellaneous Case No. 1:15-mc-00363-P1

## <u>ORDER FOR ADMISSION PRO HAC VICE</u>

The motion of Larry Klayman, for admission to practice Pro Hac Vice in the above

captioned action is granted.  Applicant has declared that he has continuously been a member in

good standing of the bars of the states of Florida and the District of Columba; and that his/her

contact information is as follows (please print):

Larry Klayman
Klayman Law Firm
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com


Applicant having requested admission Pro Hac Vice to appear for all purposes as counsel

for Plaintiff Dennis Montgomery in the above entitled action.

**IT IS HEREBY ORDERED** that Applicant is admitted to practice Pro Hac Vice in the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys.

Dated:_____

_____

United States District *I* Magistrate Judge